# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3420

_____

Employers Mutual Casualty Company,   *
                                             *
             Plaintiff - Appellee,     *
                                             *   Appeal from the United States
      v.                                *   District Court for the Southern
                                             *   District of Iowa.
Collins & Aikman Floorcoverings, Inc.,  *
                                             *
            Defendant - Appellant.    *

_____

Submitted: June 22, 2005
Filed: August 16, 2005

_____

Before MURPHY, BYE, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

This case arises out of a commercial transaction between Collins & Aikman Floorcoverings, Inc. (Collins) and Employers Mutual Casualty Co. (EMC). EMC alleged carpeting it purchased from Collins failed to comply with applicable warranties. Among other defenses, Collins alleged EMC's claims were barred by Iowa's five-year statute of limitations governing breach of warranty claims. A jury found in favor of EMC and rejected Collins's statute of limitations defense. Collins now appeals the district court's denial of its motion for judgment as a matter of law. We reverse.

# I

In the mid-1990s, EMC began working on plans to build a new office building and renovate an existing building in Des Moines, Iowa. As part of the project, EMC solicited bids for carpeting from various carpet manufacturers, specifying the carpet had to be durable enough for use under rolling chairs without the need for protective floor mats. Collins's sales representative, Jim Depke, promised he could provide carpeting to meet EMC's specifications and sold it a total of 23,931.39 yards. The bulk of the carpeting – 21,701.39 yards – was delivered before December 31, 1996, with the remainder – 2,230 yards – being delivered in 1998.

In 1999, Joyce McMickle, EMC's facility coordinator, telephoned Collins and notified it the carpeting beneath the chairs was showing signs of excess wear and discoloration. In 2000, McMickle expressed the same concerns in a letter to Collins. At trial, McMickle testified Depke told her Collins had never heard of such a problem and would work "on EMC's behalf" to determine the source of the problem. In February 2000, Depke conducted an on-site inspection and obtained samples of the carpet for testing.

In May 2000, Collins's representatives, including Depke and his sales manager, Steve Broome, conducted a second walk-through inspection at which time, according to McMickle's trial testimony, Depke or Broome again stated Collins had never encountered this problem before and repeated the earlier promise to work "on EMC's behalf" to determine the cause of the problems. Following the inspection, Broome prepared a report indicating the problem with the carpet was a breakdown in the yarn systems and it was unrelated to maintenance. Broome's report stated: "We make a product that has a 15-year warranty. . . . I think we should step up to the plate and honor this warranty." The next day, Broome wrote to EMC stating: "Please be assured, that we are trying to understand why this condition has developed, since we have not seen it occur in any previous installation."

On September 14, 2000, Collins offered to replace the worn sections of carpet but EMC rejected the offer. Ten months later, on July 11, 2001, the sides again came together to discuss the carpet problems. At this meeting, EMC formally rejected Collins's earlier settlement offer. In response, Broome reiterated Collins's claim it did not know the cause of the problems and again assured EMC it was continuing to investigate the cause. On July 27, 2001, Collins wrote EMC asking to conduct yet another inspection. EMC agreed to the additional testing and on October 2, 2001, the parties met to discuss the results. At the meeting, Collins told EMC it believed the carpet problems were caused by soiling and inadequate maintenance.

Following the October 2, 2001, meeting, the parties attempted to mediate the dispute. On August 6, 2002, after mediation proved unsuccessful, EMC filed suit. It is undisputed the five-year statute of limitations covering 21,701.39 yards of the carpeting (all but 2,230 yards) expired before EMC filed suit.

In its lawsuit, EMC alleged 1) breach of implied warranty of fitness for particular purpose, 2) breach of implied warranty of merchantability, 3) breach of express written warranty, 4) negligence, 5) negligent misrepresentation, 6) fraudulent misrepresentation and nondisclosure, and 7) breach of oral express warranty. Collins denied the allegations and asserted various affirmative defenses, including failure to mitigate damages, the statute of limitations and defenses under the Uniform Commercial Code. The case proceeded to trial and a jury returned a verdict in favor of EMC on its claims for breach of implied warranty and breach of express oral warranty. The jury rejected Collins's affirmative defenses and found the statute of limitations was tolled by the doctrine of fraudulent concealment.

Following the verdict, Collins renewed its JAML motion and moved for a new trial and remittitur. The District Court denied Collins's JAML motion but

conditionally granted the motion for new trial subject to EMC's acceptance of remittitur in the amount of $205,186. EMC accepted the remittitur and judgment was entered accordingly. This appeal followed. On appeal, Collins argues the district court erred by denying its motion for JAML because 1) the evidence was insufficient to support a finding of a fiduciary relationship, and 2) there was no fraudulent concealment.

II

A.    JAML - Standard of Review

We review the district court's denial of a motion for judgment as a matter of law de novo using the same standards as the district court. Keenan v. Computer Assocs. Int'l, 13 F.3d 1266, 1268 (8th Cir. 1994). A motion for judgment as a matter of law presents a legal question to the district court and this court on appeal: "[W]hether there is sufficient evidence to support the jury's verdict." Id. (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)). We view the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." Id. A grant of judgment as a matter of law is proper only if the evidence viewed according to these standards would not permit "reasonable jurors to differ as to the conclusions that could be drawn." Dace v. ACF Indus., Inc., 722 F.2d 374, 375 (8th Cir. 1983).

B.    Fraudulent Concealment

In Iowa[1] fraudulent concealment can toll the statute of limitations. To toll the statute of limitations, the plaintiff must prove 1) "the defendant affirmatively concealed the facts on which the plaintiff would predicate [the] cause of action," or

---

[1]The parties agree Iowa law controls this diversity case.

-4-

2) "a confidential or fiduciary relationship exists between the person concealing the cause of action and the aggrieved party" combined with proof the defendant breached its duty of disclosure. Rieff v. Evans, 630 N.W.2d 278, 290 (Iowa 2001) (quoting McClendon v. Beck, 569 N.W.2d 382, 385 (Iowa 1997)). Where a fiduciary duty exists between the parties, mere silence may be sufficient to prove the defendant breached its duty of disclosure. Kurtz v. Trepp, 375 N.W.2d 280, 283 (Iowa Ct. App. 1985). Here, the jury rejected EMC's claim that Collins affirmatively concealed facts but concluded a fiduciary relationship existed, thereby creating an affirmative duty to disclose information.

### C.     Fiduciary Relationship

Collins argues the doctrine of fraudulent concealment does not apply because there was insufficient evidence to prove the existence of a fiduciary relationship between it and EMC. We agree.

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Kurth v. Van Horn, 380 N.W.2d 693, 695 (Iowa 1986) (quoting Restatement (Second) of Torts § 874 cmt. a, at 300 (1979)).

Fiduciary relationship is

> [a] very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and fidelity of another. A "fiduciary relation" arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such

-5-

relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.

Id. at 695-96 (quoting Black's Law Dictionary 564 (5th ed. 1979) (citations omitted)).

A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*

Id. (quoting First Bank of Wakeeney v. Moden, 262, 681 P.2d 11, 13 (Kan. 1984) (per curiam) (emphasis in original)).

"Because the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." Id.

The evidence EMC presented to establish a fiduciary relationship was limited to statements by Collins's staff indicating it would "work on EMC's behalf" to determine the cause of the carpet problem. The district court personally felt the evidence was insufficient to establish a fiduciary relationship but concluded it was ultimately a jury issue.[2] We conclude, in the context of this buyer/seller relationship,

_____

[2]Collins argues the district court erred when it submitted the question to the jury because in Iowa the existence of a fiduciary duty is a matter of law for the court. We disagree. In Davis v. Ottumwa Young Men's Christian Assoc., 438 N.W.2d 10, 17 (Iowa 1989), the Iowa Supreme Court reversed a grant of summary judgment

Collins's statements were an insufficient basis upon which to find a fiduciary relationship.

We are mindful this court has previously held a fiduciary duty can arise within a buyer/seller relationship. For example, in Asa-Brant, Inc. v. ADM Investor Serv., Inc., 344 F.3d 738, 741 (8th Cir. 2003), several farmers entered into complicated hedge-to-arrive contracts (HTAs) with grain elevators for the sale and purchase of grain.

> In an HTA, a grain producer agrees to deliver at an unspecified time a predetermined quantity and grade of grain. The price of the grain is determined by reference to a futures contract price established by the Chicago Board of Trade (CBOT), plus or minus a variable component referred to as the "basis." "Basis is the difference between the price of the designated futures contract and the cash price for that commodity." Grain Land Coop v. Kar Kim Farms, Inc., 199 F.3d 983, 987 (8th Cir. 1999). The basis remains unfixed, or "floating," until the farmer elects to fix the basis, at which point the grain will be delivered. Under an HTA, a farmer has at least two sale options on his crop: he can deliver grain under the HTA, or he can defer delivery on (i.e., "roll") the

_____

noting "[a] determination as to whether a fiduciary relationship exists would, ordinarily, be a fact issue." See also Top of Iowa Coop. v. Schewe, 324 F.3d 627, 634 (8th Cir. 2002) (applying Iowa law and affirming the jury's finding of a fiduciary relationship despite district court's misgivings about the sufficiency of the evidence). We disagree with Collins's argument that Weltzin v. Cobank, ACB, 633 N.W.2d 290, 292 (Iowa 2001), holds the existence of a fiduciary duty should be resolved in each instance by the trial court as a question of law. In Weltzin, the Iowa Supreme Court affirmed the trial court's grant of summary judgment on the issue, but did so because the court found 'the facts are insufficient to support a legal conclusion that defendants . . . have a duty to the plaintiffs under [the theory of] breach of fiduciary duty.' Id. Thus, under Iowa law this is "ordinarily" a fact question, but when the undisputed facts are insufficient to find a fiduciary relationship exists, the question may be resolved by the trial court as a matter of law.

contract if he thinks he can get a better price in the cash-grain market (the current market price for grain). The buyers of the grain, usually grain elevators, would enter into HTAs with farmers and then establish a position equal to the contract with the farmers on the CBOT. In other words, the elevator would agree to sell on the CBOT the grain it agreed to purchase from the farmer. If the farmer elected to roll his HTA, the grain elevator would buy back its position on the CBOT (as it now had no grain to sell on that date) and would establish a new position on the CBOT consistent with the rolled HTA.

From 1995 to 1996, the grain market experienced unexpected price hikes. This market "inversion" created an environment where farmers consistently could make more money selling on the cash market, and consequently those farmers with HTA contracts continually rolled their HTAs, as their grain was more valuable now than in the future. Grain elevators across the country were forced to buy back expensive positions on the CBOT and purchase less valuable futures positions. The continual rolling added up to enormous margin costs on the HTAs. The question of whether farmers could continually roll their contracts, and who should pay for these large margin costs, sparked litigation throughout the Bread Belt.

Id. at 741-42.

The Asa-Brandt farmers were informed by the grain elevator they owed money on the HTAs and could no longer roll the contracts. The farmers sued arguing the elevator owed them a fiduciary duty and breached the duty by failing to adequately advise them regarding the risks associated with HTAs. A jury found in favor of the farmers and the elevator appealed arguing the jury's finding of a fiduciary relationship between a buyer and seller was unprecedented and erroneous. This court affirmed, holding

[T]he jury in this case heard evidence that [the elevator's] manager . . . was more experienced, more sophisticated, and more privy to information than were the Farmers about HTAs and the risks inherent in

their use. The Farmers also testified that they were encouraged . . . to enter into HTAs, and that they relied upon [the manager's] advice in executing them.

Obviously, this fiduciary relationship did not arise through a simple buyer/seller relationship. Rather, as the district court found, it arose through the Farmers' reliance upon their cooperative, its manager, and his advice to them with respect to growing and marketing their grain, advice which included measures to improve their yield, when to sell their grain, and most importantly, how to use HTAs to enhance the profitability of their operations.

Id. at 744-45.

We do not find Asa-Brant persuasive in the context of this case. Here, there is no compelling evidence of a fiduciary relationship between Collins and EMC. This case involved two large, sophisticated business entities and there is no evidence of inequality between them. Nor did Collins exercise influence over or dominate EMC. Further, EMC does not argue it was dependent upon Collins. Rather, the sole evidence of a fiduciary relationship comes from Collins's statement it would work on behalf of EMC to discover the source of the carpet problems. Acting on behalf of another may indicate a fiduciary relationship, but based on all the facts and circumstances of this case we conclude those two statements were insufficient as a matter of law to transform this arms-length buyer/seller business transaction into a fiduciary relationship.

III

The judgment of the district court is reversed and we remand with instructions to enter judgment as a matter of law in favor of Collins.

_____

-9-